Go ahead. Case number 20-2279 McKeon Products Incorporated v. Howard S Leight and Associates Incorporated et al. Oral argument not to exceed 15 minutes per side. Mr. Johnson for the appellate. Good morning or good afternoon. It's usually morning. Good afternoon. I'd like to reserve three minutes if I may. Okay. I think you're supposed to argue here. It doesn't bother me in particular. Wherever the court would like me to be, I'll be here. I mean, I think that's the way they're doing it today. That's fine, Your Honor. Thank you very much. May it please the court. This is an appeal from an order purporting to enforce a 1997 consent decree by forcing my client, Honeywell, to remove from certain websites, Amazon.com and others, a product called the Howard Leight Max MAX earplug. And they've been sold on Amazon.com and other websites since at least 2004. That's clear in the record. Now, we think the district court got it wrong on the language of the consent decree, which expressly allows Honeywell to continue selling to its industrial customers and which makes no reference to the Internet or anything like the Internet. And we think McKeon's motion is also barred by the doctrine of latches because McKeon waited many, many years too long. Waited, you know, sort of implies that they knew about it all along. And frankly, you all didn't have any evidence to that effect. I think, Your Honor, that under the doctrine of latches, latches is measured from – the delay is measured from the time when the plaintiff knew or should have known that it had a claim. So in order to retain their rights under this kind of consent decree, which ended some litigation, they have a proactive obligation to be sort of patrolling any kind of website or any retail brick-and-mortar store, et cetera. They have to be out there sort of on patrol. I will state, Your Honor, we have an obligation to police our own conduct. That's a lot easier than policing someone else's, though. Fair, Your Honor. We did police our own conduct. And I think everything we did is permitted under the language of the consent decree. No, I understand that's your position. But they also – they treat this as a trademark case. And in a trademark case, they've conceded they do have that exact obligation. Well, this is – we're beyond the trade – that claim got settled. Now we have a consent decree motion. Agreed. Do they have a duty to retain their rights under a consent decree, affirmatively to be out there canvassing to make sure the wrong earplugs are not being sold in the wrong place? I think they do, Your Honor. Really? Is there any case law to that effect? I'm not sure that I could cite the court to a case to that effect. I'm kind of skeptical that they would have this big obligation. It's a burdensome obligation. It's a lot easier to, you know, refrain yourself from doing the wrong thing than to make sure that, you know, frankly, a much larger entity than these folks is not doing the wrong thing somewhere. We don't think we were doing the wrong thing. No, I get that. But the doctrine of latches is still there. And this court's decision, Your Honor's decision, for now. Right, but that wasn't, you know, I don't – well, that case, one could read it to say that the doctrine applies, is available in these cases. Let me say, Your Honor, that I don't think it's very burdensome at all on the facts of this case. The product in question, the Honeywell Light, Howard Light Max MAX earplugs, were for sale from 2004 on Amazon.com. It is very, very easy to go on Amazon.com, do a search. The claim in the case is that they did a search in 2017 for the word earplugs, and these came up. And that's the first time they ever, ever checked the Internet in the 20 years after the consent decree was entered in 1997. When did you start selling with Amazon? 2009? 2004, Your Honor, is the date by which in the record that was on the Amazon.com website. So you say they had, for latches purposes, 20 years. But, of course, you didn't start with Amazon. Somebody else? I don't know. My client's predecessor started with Amazon, selling on Amazon.com. Let me put it this way. These earplugs were for sale on Amazon.com, that much is clear, by 2004. My client acquired this brand in 2010, after they'd been online for six years. Does that address the court? So Honeywell didn't begin selling on Amazon until, I thought it was 2009, is it? 2010 is when Honeywell acquired the brand. So it's not two decades, is it? Well, it is, because this brand of earplug was for sale all the way back into the 90s, obviously. So one sale is enough, right? I don't think that is necessarily true, Your Honor. But what we've got here is millions of pairs of these earplugs. Is every sale of the earplugs covered, every single sale covered by the consent decree in one way or the other? I don't think so. I mean, in other words, could Amazon simply be not contemplated by the agreement, and therefore there's retail, there's industrial, there's now Amazon. There's other things. And they would have to bring a trademark infringement claim and say, hey, you're infringing our trademark by selling on Amazon. Your Honor, I think that's exactly right, although I would add— What about the paragraph, though, that says, doesn't it reserve your client the right or elsewhere, whatever that language is? That's correct. So the way the consent decree is structured, they get the retail market. And as we read the consent decree, and we think the only fair reading of the consent decree with respect to the district court, is that the consent decree says we can't be in the brick-and-mortar corner Walmart store or the drugstore. It sure doesn't say that. Come on. Agreed, Your Honor. But that's how we interpret it. And if the consent decree under this court's precedence must be construed strictly, it shouldn't be used to change the bargain for positions of the parties. The consent decree, nowhere to your question, Your Honor, contemplates restrictions or regulations upon the Internet. Now, the parties could have negotiated between themselves restrictions on who may sell on the Internet. It existed by 1997. It applies to Walmart, right? It applies to Walmart. You can't sell on Walmart.com, right? That is not what the consent decree says, Your Honor. Well, it says Walmart. It doesn't say certain types of, you know, sales by Walmart. It says you can't give this stuff to Walmart. So in the consent decree, and that's in paragraph 7, where Walmart comes up as one example of a mass merchandiser, but if you look in that paragraph, the way it describes mass merchandisers is as stores, and it talks about stores with departments, sporting goods and firearms departments, drug and grocery departments. Amazon.com and even Walmart. Buy all that stuff online, all of it. You can now. And I think what's really happened here is that in the 20 years since the consent decree, which nowhere mentions the Internet, since that was negotiated, the world has changed. It either does the First Amendment, but it applies. But the consent decree, Your Honor, is not a sort of living constitution to be. I'm not talking living constitution. Fair, Your Honor. But it's not to be revised and amended through decisional law. If there's going to be a change to the bargained-for position of the parties, there is a motion available to them. It's not the motion they brought. They brought a motion to enforce the consent decree. Let me ask you about, I guess, I don't know, some of the details, but, like, on Walmart.com, for example, I believe you can have something shipped to the store and go pick it up, which looks almost like going into the store and getting it. I mean, why is that not? And how are they not a mass merchandiser? It just seems. I don't know, Your Honor. My understanding of the Walmart piece of the equation is that my client has never sold directly to and through Walmart.com. Third parties have sold there. I don't know, as a matter of fact and what's in the record, whether that's true with respect to this product or whether it's something that we only have shipped here. Does it make a difference, though? I mean, doesn't it make this closer to what the parties contemplated, agreed to, you know? But if we're going to go down the road of saying let's slice and dice this in a way that gives one party or the other something that it didn't bargain for, we're making an error, because the consent decree is to be interpreted, strictly construed, on the language within the four corners of the document. If we're going to change it, if we're going to say, well, now there's the Internet or now someone is selling on the moon or some other new channel of trade that's not contemplated and not regulated by this consent decree, that's a different action. It's a motion to modify the consent decree, which the expressed terms of the consent decree contemplate that the court will retain jurisdiction for motions to modify the consent decree. If they'd brought that motion, we could have had a debate in front of the district court about is anyone actually confused by this? What would be, so they could make a motion to modify, or you could make a motion, either party I assume could make a motion to modify the consent decree and say the Internet is now deemed to be retail, or I don't know, whatever it would be. Or slice and dice it. Whatever. And then the court would, without looking at infringement, without looking at any of that, or would the court have to do that, or would it be up to the parties? How would that even work? I think that the court would have to, if we're going to make a modification of the consent decree, it requires a showing, and I'm reading from a Supreme Court case, Rufo v. Inmates of Suffolk County, a showing that significant changes in factor law warrant revision, that the proposed modifications are suitably tailored to the changed circumstances. That's the kind of showing that one could imagine going before the district court and saying, well, look, now there's this thing called the Internet where some retail customers and some industrial customers, which we are expressly permitted to continue selling to, where they go buy stuff now, and they buy these kinds of products now, and so we need to rework the rules. Well, okay. So am I correct, though, in understanding that your whole argument that the consent decree is limited to brick-and-mortar stores depends on the word establishment? I don't think you are quite correct on that. I do think that establishment is the broad catch-all, and then there are examples in the consent decree of what are retail establishments. And obviously we cited the district court to both dictionary definitions of that term and legislative definitions of that term, which the district court rejected out of hand as extrinsic evidence. We think that was part of the error. Let's assume you're correct that the district court erred in saying that latches does not apply. So I'm assuming that it does apply for the purpose of these questions. You need to show prejudice, and as I understand your argument on prejudice, it's that, well, yes, we knew about this consent decree, but we didn't know they were going to enforce it this way, and so therefore we wouldn't have bought that place if we knew they were going to enforce it. I don't think that's quite right. You know what? Some of the cases talk about prejudice. Some call it clean hands. You took a risk. You knew about the contract. When you go on Amazon and your business jumped, what, 60% between 16 and 19? And you don't do any you don't you lose your risk. You get sued. So if you are accepting the risk, where's your prejudice? You may have won your risk, but you didn't. Our prejudice, Your Honor, is, first of all, we don't think that that's the problem, and I know that I'm out of time, so I want to respect the court. First of all, there is a presumption of prejudice in the case law if they wait more than, if it's viewed as a trademark case, three years. If it's viewed as a contract case, more than six years. They waited 14 years. Neither, so there isn't a presumption. Well, they waited more than a decade. Yeah, but there's no presumption, I don't think. Anyway, I don't want to you answer his question. But in terms of the actual prejudice on the ground, first of all, I don't believe they raised whether we had prejudice below, so I think that's waived here. But even if it weren't, set that aside for the moment. We bought this company, but we also continued to invest in and use this brand, selling online for the past 10, 11 years before this motion, I guess seven years before we were ever put on notice that this was their reading of the contract, and it is a reading we dispute. And you inch closer and closer and closer, and you're still prejudiced. Knowing you're doing that, you took a chance. I just don't get it. How are you prejudiced? You're the one that took the chance. We don't believe that this consent decree should be. Okay, that it would be an establishment, brick buildings. That's a merits question. It's not a reason to say we're not going to consider it. Fair, and I'm happy to sit or continue the dialogue. Yeah, no, I appreciate you saying that. So you'll have all your rebuttal, obviously. Thank you very much, Your Honor. And we'll hear from Mr. Huget. Thank you, Your Honors. May it please the Court. Good to see everyone again. Yeah, well, good to see everybody in person here. Last time I was here it was. . . Yeah, I know. I was sitting, you know, looking at a screen. It wasn't ideal. It wasn't ideal. Thank you. I appreciate the Court's time today, and obviously the Court's taken, the judges have clearly read the record very carefully. I think I want to focus, though, on the latches argument a little bit and make sure the Court's clear on what's at issue here. Honeywell hasn't even addressed the proper latches standard. When you're talking about prospective injunctive relief in this circuit and elsewhere, this Court has been extremely clear. You have to show something more than mere latches. So just focusing on the delay is misguided. You have to focus on was there something affirmative that McKeon did that misled Honeywell? And there's nothing in the record. The jurisprudence of this Court is very clear. In TWM, a case cited by Honeywell in their reply, when they looked at even after the statutory period ran, there was no presumption of latches. There is no delay-focused latches. What we're talking about here is there has to be an affirmative sort of act by McKeon, and the district court judge looked at that. In the order of the motion to stay, the district court judge evaluated latches under the proper standard and said even if they had addressed that standard, they didn't address the right standard. They showed nothing. So I think in that part of the judge's determination is entitled to an abuse of discretion review. So unless the Court has questions on latches, I'll move to the consent decree. I just want to make sure we're talking, the Court understands that even if Bergman hadn't decided and addressed the standard, there's nothing in Bergman that would preclude the proper application of latches. Sure. Bergman just says it's available. Correct. Absolutely. I read your briefs that suggest it wasn't available. Are you saying it is available? What I'm saying, no. I want to be very clear. I'm saying the kind of latches they're talking about is not available. But latches by estoppel or estoppel, what the courts here say is there may be an estoppel argument available. They haven't addressed it. Ordinary latches that we understand ordinary latches to be, just delay and prejudice, is not available. That's our point. We're consistent in our briefs. What I wanted the Court to focus on is that the real standard should have been something they didn't even address, which was estoppel. Some courts have called it latches by estoppel. I think in the TWM case, they called it, in this court, called it latches by estoppel. You guys are seeking damages now, according to the Blue Brief. And I may. We may. It's possible. It sounded like you're catching this point in terms of if they're seeking prospective injunctive relief. Correct. And I think under this Court's precedent, under Supreme Court precedent, under the MGM versus Petrella case, a copyright case in which the court was, which is cited by the plaintiffs, a copyright case in which the plaintiff waited nine years before bringing the suit, the courts there very clearly said, well, you may have given up your right to look back damages, but you did not give up your right to prospective injunctive relief, nor did you give up your right to future damages potentially. So when we said that, when I said that to Judge Borman in the lower court, by the way, I raised it in the context of the, what's an appropriate bond. But I also wanted the Court to be on notice, to be fair, depending on what this Court did and what that Court did, I may be seeking future damages. This has gone on a long time. It's been several years and no remedial action's been taken. So that's the only point I wanted to make. I just want to be clear that we're talking about the right kind of latches because Judge Borman talks about that in one of his foot, in his footnote one in his motion, in his order of motion to stay. So I just want to briefly touch on the interpretation issue. And I think Your Honor hit on something I wanted to raise, and that's the walmart.com point, which is, which really to me makes this interpretation that they have somewhat nonsensical. You can go to walmart.com, you can order max earplugs on walmart.com, which is not something that they've addressed. This is in the lower court record. And you can go to the store and pick it up. So that happened. And the other point I want to make about the scope of the consent decree, it was never intended to be limited to brick and mortar stores. There's nothing in it. And even then, the parties weren't limited to selling via brick and mortar stores. They were selling via catalogs. So you could sell on a catalog at the time. Do you think, I'll ask you the same question, do you think every sale of these earplugs is covered in one way or another by this consent decree? Yeah, I think so. I think that's fair. I think that's fair. Because it does say industrial safety market or elsewhere, other than retail market. And my client is simply focused on the retail market. That's all we care about. So that's the lower court. We'll tell you the this court. We're just focused on the retail market, however it's sold. So I don't think that there was anything else that they raised. Some Internet sites like Amazon and others have like B2B, business-to-business type portals, where you would be more likely to have industrial safety, whatever purchases, businesses purchasing amounts. Would those be barred as well? No, no. Because the focus, again, of the consent decree is the market you're selling it to. The markets are the people. Markets aren't stores. Markets are people. It's a retail market. Are you a retail consumer or are you an industrial safety consumer? If you're an industrial safety consumer and you use the industrial safety websites, then I think that would be permissible. I'm not saying that every sale is. But what if a consumer uses – I mean, there are certain websites that are not – I mean, consumers go to Costco and restaurants go to Costco. I mean, it's available to a lot of people. You're just saying that they can't sell to the consumer who's purchasing just a set of earplugs for home use or something? That's correct. That's correct. They can't sell to a retail consumer. How is that practical? How is anybody going to – Well, and I think the question of practicality, and it's one that Honeywell has raised repeatedly, and how do we know, it was never entirely clear and clean at the time. Parties did their best to try to divide up these two markets. It was always possible even at the time – let's say you had a factory that ran out of earplugs and they ran down to – the manager runs down to Walmart to buy something at Walmart even though it's a mass merchandiser. It was always possible that there might be some overlap. The focus is to protect the trademarks in the lanes that we defined as well as we possibly can. Could I tell the court that you could have 100% compliance? No, but you can't turn a blind eye, a willfully blind eye, to the sales that you're making and your distributors are making, which we pointed out repeatedly to the lower court and the lower court agreed with. So I hope that answers your question. But the Internet – again, the last point I want to make is the Internet is not a new market. It's a new way for people in certain markets to order product, and I think that's the point I'd like to leave the court with. There were two relevant markets before the Internet, the retail and the industrial safety market, and there are two markets after the Internet. So unless the court has any questions of me, I would just ask that the court affirm the lower court – I just think it's odd to be talking about dividing markets up. I'd rather – can I answer the question in the living constitution instead of the – not in this context. I think you're probably – sometimes we, in the pharmaceutical area, we can have those sorts of problems, but not here. There's too much competition. Too many other people can – too many other people make earplugs. McKeon has a number of different types of competitors, including generics and that sort of thing. So I don't think there's an antitrust problem here. I haven't thought through that completely, but I do know that they're representing this client for a number of years. There are a number of competitors out there. Unless the court has any other questions, I'll see you the rest of my time. All right. Thank you. Thank you, sir. We'll hear rebuttal. Thank you very much, Your Honor. The last question in the colloquy about websites where people and industrial customers might buy I think really points to a problem here. McKeon has said in its briefing, and I think this is the first time these were raised, was in the response brief, that Honeywell is allowed to sell on industrialsafety.com and industrialsafetygear.com. Now, I don't know that those are properly in the record, but I went and visited them. If I've got an address and a credit card, I can buy on those. I don't know how to police what websites we are allowed to buy and which websites we are permitted to sell on, which ones we are prohibited from selling on. But you didn't ask to modify the contract. You just went ahead and did it. Neither side asked to modify the contract. Your Honor, let me just be clear, though, and I mean no disrespect. The contract says we are permitted to sell to industrial customers and elsewhere unless it's expressly prohibited by the agreement. That's paragraph 8 of the consent order. We don't think that the Internet sales that have happened are expressly prohibited by the agreement. So we don't believe that we have ever done anything wrong under this contract and we don't think there was any need to modify it. However, if we're here now and we've been selling online for the past decade or more, we think that that is in itself at least some evidence that both sides felt the Internet was unregulated by this agreement. The clearer it is that these website sales were off limits, the sooner that McKeon should have raised its hand and said, Honeywell, what are you doing? They repeatedly complained to us about other alleged violations of the consent decree. That's in the record. Never once did they suggest until 2017 that these sales were problematic, even though they were perfectly open and obvious. Did they complain about non-Internet sales? They complained, as I recall from the record, and forgive me if I'm a little fuzzy on this. All of this is before my time. They, I believe, complained about distributors that Honeywell sold to taking those products into brick-and-mortar type stores. I believe that's the types of complaints that I seem to recall from the record, Your Honor. But they never complained about Internet sales until 2017. The consent decree does expressly bar your clients from selling these Max Ear plugs on the retail market. That's right. That's absolutely right. But you think that retail market, as defined here, means only brick-and-mortar. That's right. I mean, like, you know, I mean, most people would think that the Internet's part of the retail market. If the parties had intended for the retail market to include the Internet, they could have written that into the consent decree. Why is it a more natural reading that retail market, even as defined here, simply refers to the markets, whatever form they might take, where people make retail purchases? And we addressed this in the briefing. Industrial market is defined in terms of who the customers are. Retail market is defined in the consent decree as where the stuff is sold. And all the examples that are given seem to refer to the brick-and-mortar corner drug and grocery stores and suburban Walmart stores as they operated in 1997. It would have been very easy for the parties to write a rule that didn't give Honeywell everywhere else that's not expressly prohibited. But this is what they came up with. You mean they could have said the retail market, meaning wherever consumers buy for home use or something like that? That could have been. In other words, you're saying it could have been defined by the type of customer. Correct, and it was not. The industrial market was defined that way. The retail market. But why isn't Walmart and Meijer and Walgreens just a proxy for that retail customer? A couple of things there. One is it is defined as the places, and it seems to use physical locality-type language. We've addressed that in the briefing. But they didn't say wherever retail customers buy, they can sell, and wherever industrial customers buy, we can sell. They talk about stores, departments of stores. They do say departments, but so does Amazon has departments, right? I mean, Paragraph 7, I think it is, whatever. You know what I'm talking about on the third page of the consent decree. It talks about retail establishments. I guess that's kind of, I mean, it doesn't, you know, that's basically, and then it illustrates some of the stores that were around at the time,  Your Honor, I won't deny that one could interpret establishments in several different ways. Yeah. And that there may be an ambiguity in the context. If there's an ambiguity, that's to be resolved through an interior hearing. Judge Borman thought there wasn't an ambiguity. I recognize that. And he thought, of course Amazon is a retail establishment, and that term isn't hidebound, you know, by the sorts of establishments that existed then. I understand that that is absolutely what the district court found. We don't think that that is a fair reading on a strict construction of the consent decree, Your Honor, and so for those reasons, and for the reasons discussed in the latching section of the argument, we think the district court should be reviewed. Okay. Well, we thank you both for your thoughtful arguments. Thank you very much, and it's really a pleasure to be here in the courtroom with you. Yeah. Okay. Case will be submitted. Thank you.